HOWARD YOUNG GALLERIES, INC. *v*. UNITED STATES (No. 3964)[1]

United States Court of Customs and Patent Appeals, June 17, 1936

Barnes, Richardson & Halstead (*Joseph Schwartz* of counsel) for appellant.
*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks* and *Charles J. Miville*, special attorneys, of counsel), for the United States.

[1] T. D. 48413.

[Oral argument May 19, 1930, by Mr. Schwartz and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellant entered at the port of New York an original painting in oil entitled "The Meet" by J. F. Herring. The verified protest of appellant shows that the "London house" of appellant, the Howard Young Galleries, Inc., of New York, obtained the painting on approval from A. Walker of London and shipped the same to the appellant at New York for its consideration and approval.

Appellant entered the painting as free of duty under paragraph 1811, Tariff Act of 1930, as an artistic antiquity having been produced prior to the year 1830. The invoice stated that the painting was "English. circa 1825." The United States appraiser, after examining the painting, was of the opinion that it was not an artistic antiquity produced prior to the year 1830, and in his answer to the protest said:

The merchandise in question is marked X on the invoice and consists of one painting entitled "The Meet" by J. F. Herring, a work of art, believed to be original. It was entered free of duty under par. 1811 of the act of 1930, but, in the opinion of this office, it is not an artistic antiquity produced prior to the year 1830. It was therefore advisorily classified by this office as a painting, a work of art at 20% ad valorem under par. 1547 (a-1) or free on oath under paragraph 1807 of the Act of 1930.

The collector, for reasons which are not clear, classified the merchandise as dutiable at 20 per centum under the "works of art" paragraph 1547 (a), and assessed the same with duty at 20 per centum ad valorem, and in addition levied a 25 per centum ad valorem duty under the following quoted provisions of section 489 of the Tariff Act of 1930:

SEC. 489. ADDITIONAL DUTIES.

* * * If any article described in paragraph 1811 and imported for sale is rejected as unauthentic in respect to the antiquity claimed as a basis for free entry, there shall be imposed, collected, and paid on such article, unless exported under customs supervision, a duty of 25 per centum of the value of such article in addition to any other duty imposed by law upon such article.

The collector made the following report:

Respectfully referred to the U. S. Customs Court for decision. The mdse. in question consists of one painting, "The Meet", by J. F. Herring, in the opinion of the Appraiser, a work of art, and original but not an artistic antiquity produced prior to the year 1830, as entered.

Duty was assessed at 20%, Par. 1547, and in addition at 25%, Section 489 Act of 1930. Note shippers declaration, herewith, from which it appears the artist is dead.

Application to change entered classification from Par. 1811 to 1807 was denied in Bureau of Customs letter of Aug. 4, 1930, 6-28-145-1867. Appraisers special report herewith. The protest was received within the statutory time.

The importer protested the classification and assessment of both the 20 per centum and the 25 per centum duties, claiming that the merchandise was an original painting and was free under paragraph 1807, Tariff Act of 1930, and that by reason of this fact the 25 per centum additional duty should not have been assessed, and that there was no intention on its part to misrepresent the facts or defraud the Government.

The pertinent provisions of the paragraphs involved are as follows:

PAR. 1547 (a) *Works of art, including* (1) *paintings in oil* or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same, * * * 20 per centum ad valorem. [Italics ours.]

FREE LIST

PAR. 1807. *Original paintings in oil*, mineral, water, or other colors, * * *.

PAR. 1811. Works of art (except rugs and carpets made after the year 1700), collections in illustration of the progress of the arts, works in bronze, marble, terra cotta, parian, pottery, or porcelain, *artistic antiquities, and objects of art of ornamental character or educational value which shall have been produced prior to the year 1830*, but the free importation of such objects shall be subject to such regulations as to proof of antiquity as the Secretary of the Treasury may prescribe. * * *. [Italics ours.]

The United States Customs Court, Third Division, sustained the protest as to the claim for classification under said paragraph 1807, and overruled the same as to the claim that the merchandise was not subject to the 25 per centum additional duty under said section 489.

The Government did not appeal from said judgment. The importer appealed from the judgment of the court with respect to the additional duty levied, and here contends that it was not the intent of Congress to require the levying of the 25 per centum additional duty where the collector rejected the antiquity claim made by an importer on goods which were free of duty, and argues that the language of the act "a duty of 25 per centum of the value of such article in addition to any other duty imposed by law upon such article", implies that additional duties can be levied only where there are other duties to which the penalty duty is an addition. On this phase of the case, appellant cites *Russell* v. *Williams*, 106 U. S. 623, in which the case of *Hadden* v. *Collector*, 5 Wall. 107 was discussed. It also cites and quotes extensively from this court's decisions in *United States* v. *Hogan*, 12 Ct. Cust. Appls. 121, T. D. 40048, and *United States* v. *Rice & Fielding, Inc.*, 13 Ct. Cust. Appls. 149, T. D. 40979, and *Procter & Gamble Manufacturing Co.* v. *United States*, 19 C. C. P. A. (Customs) 415, T. D. 45578.

Appellant stresses, with great emphasis, the fact that section 304 of the Tariff Act of 1930 provides for the assessment of a 10 per centum additional duty on merchandise which is not legally marked "or, if such article is free of duty, there shall be levied, collected, and

paid a duty of 10 per centum of the value thereof," and that the omission of that term or similar language in section 489 indicates that it intended only that the additional penal duty of 25 per centum should be levied upon dutiable goods.

It is further contended by appellant that the legislative history of the provision under consideration clearly shows that Congress intended to make it apply to dutiable articles only.

The Government argues that our decision in this case is controlled by *Russell* v. *Williams, supra,* and *United States* v. *Rice & Fielding, Inc., supra,* and argues that under the rule laid down in *United States* v. *Ellis Silver Co.,* 16 Ct. Cust. Appls. 570, T. D. 43297, that if Congress had not intended the term "additional duty" to be applied to free goods "it would have used appropriate language in the paragraph for that purpose."

For the purposes of this case it is conceded that the trial court correctly sustained the protest as to the collector's classification of the painting under paragraph 1547 (a) and his assessment of the same with a duty of 20 per centum. The sole issue presented here is: When Congress enacted said section 489, did it intend that the additional penal duty of 25 per centum should be levied upon imported goods which are otherwise free of duty when the claim in respect to antiquity is rejected?

The trial court concluded that the insertion of the above-quoted phrase in said section 304 was "merely as an evidence of abundance of caution" and that "no implication can attach to the omission thereof from section 489," and called attention to this court's decision in *United States* v. *Rice & Fielding, Inc., supra,* which it regarded as controlling of its decision of the instant issue. The trial court cited several authorities which we do not consider necessary to consider here.

There is no case cited or found which is squarely on the point here involved.

The Supreme Court of the United States in *Russell* v. *Williams, supra,* had before it the question as to whether or not tea, the product of China, was properly assessed with a 10 per centum additional duty by virtue of the statute then in force, section 6 of the act of March 3, 1865, which provided that—

there shall be hereafter collected and paid on all goods, wares, and merchandise of the growth or produce of countries [east] of the Cape of Good Hope (except raw cotton and raw silk as reeled from the cocoon, or not further advanced than tram, thrown, or organzine) when imported from places west of the Cape of Good Hope, a duty of ten per cent *ad valorem* in addition to the duties imposed on any such articles when imported directly from the place or places of their growth or production.

The goods had been imported from Liverpool, England. The issue as presented revolved around the question as to whether or not the

10 per centum additional duty could be levied on the tea. There the court said:

It was very early contended by importers that the law was not intended to affect goods which were on the free list, and exempt from any duty,—a position somewhat plausible from the words of the law, which were these: "A duty of ten per cent *ad valorem* in addition to the duties now imposed on any such articles." It was argued that the ten per cent could not be said to be *"in addition* to the duties now imposed," where no duties were imposed. But such a construction would evidently have defeated the purpose of the law; and, accordingly, it was decided by this court in *Hadden* v. *The Collector*, 5 Wall. 107, that the act of 1862 (which was then under consideration) applied to goods which at the date of the act were duty free, as well as to those which were subject to duty. Reliance was placed in that case, it is true, on the literal phraseology of the law; but the judgment of the court was in conformity with the clear intent of the legislature, as we have supposed it to be.

The court's decision was based upon the proposition that the 10 per centum additional duty provided in the statute then under consideration—

was a general commercial regulation for the encouragement of direct trade with those countries [countries east of the Cape of Good Hope], as well as for the benefit of American shipping,

and was not simply an increase of duties for the purpose of revenue. In other words, the court held there that since Congress intended to encourage shipping, its purpose would have been defeated if the 10 per centum duty had not been levied, even though the goods were otherwise free of duty.

It is argued by the Government in the instant case that one of the purposes of the act here under consideration is to discourage deception of the American purchasing public as to the antiquity of imported goods. The importer insists, however, that the legislative history shows that the purpose of the act is to put a higher duty on goods of this character so as to protect American manufacturers and that said provision was enacted because enormous quantities of furniture, etc., were being shipped into this country under false claims of antiquity, and that when such importations were admitted free of duty they came in direct competition with American-made goods.

We do not think the case of *Russell* v. *Williams, supra,* is supporting authority for the contentions of the Government here, since we can not ascribe to Congress the intent to make duty-free works of art subject to the "additional" duty either for the purpose of protecting an American industry, or to encourage commerce, as was the case in *Russell* v. *Williams, supra.*

In *United States* v. *Hogan, supra,* this court had under consideration paragraph 19 of the Emergency Tariff Act of 1921, which imposed an additional duty on manufactures of wool or camel's hair of "45 cents per pound in addition to the rates of duty imposed thereon *by*

*existing law."* [Italics ours.] The Emergency Tariff Act of 1921 superseded, in part only, the tariff act of 1913, and paragraph 422 of the tariff act of 1913, free-listing the particular kind of manufactures of camel's hair involved in the case, continued in full force and effect. This court held that it was the intent of Congress—

to impose a cumulative rate of duty upon articles which were already dutiable by law, for they were the only ones which could be subjected to rates of duty in addition to the rates then imposed upon them by existing laws.

We there discussed the case of *Russell* v. *Williams, supra,* and said:

Furthermore, the peculiar phraseology of paragraph 19 favors this construction. It imposed a certain rate of duty upon the described merchandise "in addition to the rates of duty imposed thereon by existing law." The natural import of this language was to impose a cumulative rate of duty upon articles which were already dutiable by law, for they were the only ones which could be subjected to rates of duty in addition to the rates then imposed upon them by existing laws. The word "additional" signifies "the joining together of several things into one amount." (Oxford Dictionary.)

The Government cites certain decisions of the Supreme Court as authority for its contention, but we think that these may be clearly distinguished from the present case. They are Hadden *v.* the Collector (72 U. S. 107); Sturges *v.* the Collector (79 U. S. 19); Gautier *v.* Arthur (104 U. S. 345); and Russell *v.* Williams (106 U. S. 623). These cases called for an interpretation of a law enacted by Congress on July 14, 1862, and afterwards repeatedly reenacted, the pertinent provision whereof as amended was as follows:

That there shall be hereafter collected and paid on all goods, wares, and merchandise of the growth or produce of countries [east] of the Cape of Good Hope (except raw cotton and raw silk as reeled from the cocoon, or not further advanced than tram, thrown, or organzine), when imported from places west of the Cape of Good Hope, a duty of ten per centum ad valorem, in addition to the duties imposed on any such article when imported directly from the place or places of their growth or production.

It must be conceded that the phraseology of this enactment is similar to that now in question. Under it, however, the Supreme Court held that goods which were then free of duty when imported into this country directly from the country of their production east of the Cape of Good Hope became dutiable at the rate of 10 per cent ad valorem when imported from a port west of the cape, notwithstanding the use in the law of the clause, "in addition to the duties imposed on any such article when imported directly from the place or places of their growth or production." The Government contends that this ruling covers the present case. We may say briefly, however, that the foregoing decisions were chiefly based upon the manifest purpose of Congress that the imposition in question should serve as a discriminating duty for the encouragement of direct trade between this country and the countries east of the Cape of Good Hope for the benefit of American shipping, which purpose naturally contemplated dutiable and non-dutiable goods alike, and would have been defeated pro tanto by the adoption of the opposite construction; furthermore, the inclusion of an express exception of certain goods within the body of the enactment was construed to prohibit the allowance of any other exception thereto under the rule expressio unius est exclusio alterius; and, moreover, the emphatic reference in the premises of the act to "all" articles, etc., tended also to sustain the conclusion reached therein by the court. The decisions therefore were not based so much upon the language common to the two enactments as upon rules of construction aliunde.

In .the case now at bar the considerations which aid in the construction of the controlling paragraph tend to sustain the claim for free entry, *for there is no reason to believe that Congress intended in the emergency act to depart from its policy of favoring this particular kind of press cloth, to which it had specifically granted free entry in the act of 1913.* It may well be assumed that if such had been the legislative purpose it would have been expressed in some more definite form than appears in the emergency act. [Italics supplied.]

We think much that was said there is applicable here. There is nothing contained in the controverted provision or the legislative history of the same which would suggest that Congress sought by said section 489 of the Tariff Act of 1930 to depart from its policy of favoring original paintings in oil or that the act was primarily intended for the purpose of increasing the revenues of the United States by imposing an additional duty upon goods which were otherwise free.

In *United States* v. *Rice & Fielding, Inc., supra,* a question in some respects similar to that involved in *United States* v. *Hogan, supra,* was before the court. The goods there involved were camel's hair noils, and we held, upon that record, that when camel's hair was advanced in a certain manner provided by the statute, it was the intent of Congress that the term in the statute "in addition to the rates then imposed upon them by existing law" should be so construed as to make applicable the additional duty regardless of whether the merchandise was otherwise free of duty. In the opinion the reasons why the court thought that it was the intent of Congress to bring about such a result are pointed out. We there said:

There is a marked distinction between the issues considered and determined in that case [the *Hogan* case] and those under consideration in this case. Paragraph 651 of the tariff act of 1913 provides for "all noils", which included the camel's-hair noils involved in this case.

Paragraph 19 of the emergency act provides for "wool and hair of the kind provided for in paragraph 18, *when advanced in any manner or by any process of manufacture beyond the washed or scoured condition.*" [Italics ours.]

The quoted language of the court in the case of *United States* v. *Hogan, supra* is open to the interpretation that paragraph 19 was intended to amend only the dutiable provisions of the tariff act of 1913. Upon reconsideration we think that the language used in that case was too comprehensive. It was *applied* and should be *confined* to the issues there involved. The words "in addition to the rates then imposed upon them by existing law" should be read and interpreted in connection with the remainder of the paragraph, as well as paragraph 18, *supra,* and when so read and interpreted it is manifest that Congress intended to include within the provisions of those paragraphs unwashed, washed, sorted, and scoured camel's hair and such hair when advanced in any manner beyond the scoured condition, whether or not a separate tariff entity and whether dutiable or free of duty under the tariff act of 1913.

It will be observed that the court there discussed the *Hogan* case and certain broad language therein was held to be "too comprehensive." It is true that in the *Rice & Fielding, Inc.,* case, the court arrived at the conclusion that Congress intended that an *additional*

duty should be levied on the goods there at bar although such goods would otherwise have been free. The statute before us and the circumstances surrounding its enactment, however, differ materially from those which were under consideration in the *Rice & Fielding, Inc.*, case, *supra*. There it was proper, as it is here, to look behind the language used in order to ascertain the legislative intent.

The legislative history of section 489 of the Tariff Act of 1930, pointed out by the importer, is, briefly stated, to the effect that Senator Vandenberg of Michigan, in which State are located many furniture factories, first introduced an amendment to the Tariff Act of 1930 somewhat different from that which finally became the law, which proposed amendment provided for a duty of 50 per centum of the value of the article imported where its claimed antiquity was unauthentic. This amendment was debated on the floor of the Senate, and Senator Smoot, chairman of the Senate Committee on Finance, and Senator Vandenberg, the author of the amendment, made a great number of statements as to the nature and purpose of the amendment, much of which we do not quote here, and some of which we quote and think is quite important. The following is quoted from the Congressional Record, volume 71, part 4, pages 4325 *et seq:*

Mr. VANDENBERG. * * * May I say to the Senator that in the matter of furniture alone, as nearly as we can discover by very careful inquiries abroad, there is at least $15,000,000 of fake "antique" furniture coming into the country every year under the cover of this free-entry permit when it is not entitled to free entry at all, and when it is not the intention of Congress that it shall have free entry; and yet it comes and comes, and there is never a penalty to interrupt the traffic.

    \*        \*        \*        \*        \*        \*        \*

Mr. VANDENBERG. * * * and the amendment as proposed is to the section of the law which deals with additional penalties.

I say just this in conclusion, because it seems to me the proposition can not be controverted. Under this section providing for additional penalties, if any fraud is discovered in a manifest to-day, an immediate penalty of 1 per cent of additional duty automatically occurs for every 1 per cent that there has been fraud perpetrated in the declaration. Yet the greatest of all frauds is perpetrated in the declaration which undertakes unlawfully to accomplish free entry, yet there is no penalty whatever at that point. It is ridiculous thus to suspend our penalties at the point of maximum deceit.

    \*        \*        \*        \*        \*        \*        \*

Mr. VANDENBERG. The Senator from Michigan offered his amendment because he felt it belonged in the penalty clause. I still think it belongs in the penalty clause. * * *

    \*        \*        \*        \*        \*        \*        \*

Mr. VANDENBERG. The sole purpose of the amendment is to penalize the fraud against the Treasury at the customhouse under whatever rule is subsequently written. That is the sole question.

    \*        \*        \*        \*        \*        \*        \*

Mr. VANDENBERG. * * * I offered this amendment originally as a penalty clause to be attached to an administrative clause where it certainly is germane and proper. * * *

*       *       *       *       *       *       *

Mr. VANDENBERG. * * * I am arguing against those who, in a large and organized way, are attempting to make money out of the exploitation of the Treasury through the perpetration of fraud at the customhouse; and I have no other objective. * * *

*       *       *       *       *       *       *

Mr. SMOOT. I want to call the Senator's attention to the fact that this is to apply only in cases where there is fraud. I would not hesitate to penalize the fellow who tried to steal from the Government of the United States, and that is all there is to this amendment. * * *

*       *       *       *       *       *       *

Mr. VANDENBERG. Does the Senator understand that the amendment applies only to antiques that are imported for purposes of resale and does not apply to the individual who has purchased an antique, even if he has been imposed upon, and is bringing it in solely for his own purposes? It does not apply to antiques brought in for exhibition purposes. It applies solely to antiques that run the customhouse for the purpose of defrauding the Treasury and then defrauding the American public.

*       *       *       *       *       *       *

Mr. VANDENBERG. This is how the Government is penalized: The manufacture and sale to Americans of synthetic antiques, particularly furniture, has now come to be such a highly organized enterprise that under existing circumstances it is the belief of the Treasury Department that they are not detecting and identifying at the customhouse more than half of the counterfeits.

Therefore all of that which is not identified is, of course, cheating the Treasury, and it is the belief of those who have studied the matter—and that includes not only myself but it includes the experts of the Treasury Department—that the only possible defense that can be erected in behalf of the Treasury at that point is to emphasize the penal clause so that it ceases to be quite so inexpensive to cheat the United States.

The Senate passed the amendment in substantially the same form as it appears in the act with the exception of matter with which we are not here concerned. In conference, certain changes, not material here, were made.

The Government argues, in effect, that the importation of any so-called unauthentic artistic antiquity misleads the American purchaser and that the purpose of the act, as is evidenced by the following sentence from the above-quoted statement by Senator Vandenberg, "It applies solely to antiques that run the customhouse for the purpose of defrauding the Treasury and then defrauding the American public," was to prevent such an imposition upon the American public, and that unless the additional duty was imposed on free, as well as dutiable goods, the purpose of Congress would not be carried out.

While this is not an illogical position for the Government to take, we think a consideration of this viewpoint should not outweigh the fact that it is not reasonable to suppose that Congress had intended to

abandon its traditional policy of encouraging appreciation of the fine arts by free-listing the character of merchandise here involved.

The circumstances surrounding the enactment of the controverted provision at bar do not indicate that Congress had the same purpose in mind in respect to subjecting free goods to the 25 per centum duty as it did when it had under consideration penal duties for failure to mark, or so-called additional duties for undervaluation.

Therefore, it seems to us that it was the intent of Congress to impose an additional duty, even where there was no fraud, upon goods which would be dutiable if not produced prior to 1830, and that it did not intend by the enactment of section 489 to place a duty upon an original oil painting which Congress has always given a preferred tariff duty status, for purposes which are obvious.

We think also, that in view of the careful consideration given the matter by the Congress, if it had intended to have the additional duty apply to articles which were free under said paragraph 1811, it would have used appropriate language to have accomplished such purpose, as it did in said section 304 of the same act.

In view of the differences between the legislation involved in our decision in *United States* v. *Rice & Fielding, Inc., supra,* and the legislation at bar, it is thought that the trial court erroneously applied the rule of legislative adoption of judicial interpretation. We see no room for the application of that rule in this case. See *Cunard Steamship Co.* v. *United States,* 22 C. C. P. A. (Customs) 615, T. D. 47605.

In *Procter & Gamble Manufacturing Co.* v. *United States, supra,* we said:

> The master rule, in the consideration of all statutes, has been to so interpret them as to carry out the legislative intent. *Markell* v. *United States,* 16 Ct. Cust. Appls. 518, T. D. 43239; *United States* v. *Oregon, etc.,* 164 U. S. 526, 539; *Hawaii* v. *Mankichi,* 190 U. S. 197, 213; *United States* v. *Katz,* 271 U. S. 354.

Applying this rule to the issues at bar, we conclude that Congress never intended to require that 25 per centum additional duty be levied upon an original oil painting merely because an importer, without fraudulent intent, entered it under the wrong free list paragraph, claiming it to be an artistic antiquity. Appellant's protest should have been sustained in *toto.*

The judgment of the United States Customs Court is *modified.* It is *affirmed* as to its holding that the merchandise is free of duty under paragraph 1807, and *reversed* as to its holding that that part of the protest directed against the 25 per centum levying of additional duty should be overruled. The cause is *remanded* for further proceedings not inconsistent with the views herein expressed.